Good morning. We are here to hear the in-bank argument in the United States v. Valdes-Vega. Our counsel ready? You may proceed. Good morning, Your Honors. Gretchen Susie Day on behalf of the appellant, Mr. Valdes-Vega. If it pleases the Court, I would like to reserve five minutes for rebuttal. Contrary to the government's assertion in its petition for rehearing, the majority of the three-judge panel which heard and decided the Valdes-Vega case did not employ a divide-and-conquer methodology that serially discounted the factors relied upon by the Border Patrol officers, nor did it substitute its own interpretation of the factors for that of the agents in assessing reasonable suspicion. The government's assertion is based on the U.S. Supreme Court case of U.S. v. Arvizu. Arvizu specifically struck down the Ninth Circuit's decision in Arvizu by stating that it created a categorical set of rules which would clearly delimit the extent to which certain factors may be considered by law enforcement officers in making stops as the one made in Arvizu. The majority of the panel did not do that. The majority of the panel did not violate the rule indicating that factors which are evaluated separately from each other and are excluded or rejected at that point in time violates the totality of the circumstances. Although the three-judge panel, or may I say the majority of the three-judge panel, specifically articulated in its opinion at least seven or eight times that it did not reject any of the elements or factors that were relied on and testified to. You understand, we're not reviewing the three-judge panel. We're reviewing the district court. The three-judge panel opinion is now off the table. Yes, Your Honor. It's been vacated, or at least it's not citable. So your argument should be directed to whether or not we affirm or reverse the district court. Yes, I would. I know you'd like to shut down the three-judge panel majority opinion verbatim, but how is that going to happen quite that way? You need to argue the case as if it were argued for the first time on appeal. Well, Your Honor, in the petition for rehearing, the basis was a divide-and-conquer violation. However, when you look at what the district court judge did, she essentially did the same thing. In her considerations of all of the factors, she separately absolutely considered all of the factors which were articulated, the speed, the erratic behavior on the freeway, the fact that this portion of the I-15 had been an area where drug smugglers and or alien smugglers had been restrained and arrested. However, when she came to the element of the cleanliness of the truck, she specifically excluded that. She rejected that during the evaluation of each factor separate from each other. So what the government has criticized essentially is a criticism that would be relevant to the district court's process of evaluation. Let me try again and go back to the Chief Judge's question.  It's gone. Tell me why on this record the totality of the circumstances don't add up to reasonable suspicion. Not what the district judge said or didn't say. The facts seem undisputed. So let's add all those facts up together and tell us why they don't add up to reasonable suspicion. They don't lead up to reasonable suspicion because in order for a Border Patrol agent, other than at a checkpoint, to make a reasonable constitutional stop, there must be a particularized and objective basis believing that the person, Mr. Valdez Vega in this case, was in fact smuggling either aliens or drugs. And they must be aware at that moment in time before stopping him of articulable facts to support that conclusion. That's the legal standard. We all agree. Yes. In this case, there was approximately, he was traveling at approximately 70 miles from the U.S.-Mexico border. That area is within San Diego County. He was on the I-15 freeway. The I-15 freeway is a significant, well-developed new freeway compared to a remote, isolated road. That freeway as the- He had Baja plates, right? So that suggested that he had crossed the border. It's not like having a California plate that might have come from San Diego. This indicates this is a vehicle that at some point must have crossed the border into the United States. Right? That's a significant factor, isn't it? Justice Kuczynski, I would respectfully disagree because there was no- Calm. Calm, Judge. All right. I prefer it, but you know, you can call me whatever. Just answer the question. There was no particularized articulable fact to indicate that they had knowledge where the origination point was on the day that- Well, Baja is, as best I know, all of Baja is south of the United States border. So if you have Baja plates, the vehicle must have at some point crossed from Mexico to the United States. I can't imagine what other reasonable inference one can throw about the vehicle with Baja California plates. It's called Baja California, right? Yes, Your Honor. However, if we look- Lower California, right? There needed to be more articulable facts relating to the specific individual who was apprehended. There was no tip- My answer, Judge, was this question, and your answer was, well, this was just a car traveling on a big highway. You know, it's a big, well-developed highway. It has a lot of traffic. I was merely pointing out that there was one other factor suggesting it wasn't just coming from San Diego. It must have come from further south than San Diego because it had plates, licensed plates from a jurisdiction south of our border. So it must have crossed the border. Isn't that something that we consider in the totality of circumstances? Licensed plates from Baja under the appropriate circumstance would be of some weight in evaluating reasonable suspicion. However, in this case, there was no tip that he had recently crossed the Baja or Mexico-U.S. border. There was no information that the Border Patrol agents had at that time that he was engaged in any activity that might have originated, and speculation is no better than a hunch. The Border Patrol agents indicated that not only did they become suspicious because of the licensed plates, but because he was in a F-150 Ford truck, which was the type of vehicle that historically had been used in smuggling drugs or aliens. Certainly, that is not sufficient to determine that this particular person was involved in that type of activity. But it's not irrelevant, right? It is a factor that points towards suspicion. It's a bit of the totality of circumstances. Not enough. I mean, when you say this is not enough and that is not enough, you're doing exactly what the Supreme Court said we can do, and to say divide and conquer, and to say this fact is not enough, this fact is not enough, this fact is not enough. I mean, clearly the fact that he has the kind of vehicle that's used in smuggling, and the officers know from their experience that he's used in smuggling, is a factor that tends to point towards suspicion. Your Honor, it would have some value in weighing a factor within the totality. We've got him traveling with Baja plates, so that is something that in the totality weighs towards suspicion. We have him in a vehicle that's known to be used for smuggling. That is something that weighs in the totality in favor of smuggling. It is relatively close to the border in an area known for smuggling. You would agree that that weighs in favor of smuggling, too, doesn't it? Your Honor, I think that when we take the totality of the circumstances, if we look at the case of U.S. v. Rodriguez, for example, are we going to put a large segment of society and just ensnare them into criminal activity because of a certain profile that is associated under certain circumstances, not all circumstances, with criminal behavior? And the cases indicate no. I'm sorry, we don't ensnare anybody into criminal activity. People do criminal activity on their own. The question is, are they going to be stopped? They're not being criminal prosecuted, they're simply being stopped or ensnared to commit crimes. Nobody forced a client to carry a consulant, right? The basis of the stop has to be reasonable suspicion. And to identify a certain type of a vehicle, a truck, that the Border Patrol agent actually indicated in his testimony, he had no idea what the numbers were, what the percentages were of other trucks that were involved in illegal smuggling. He indicated that sometimes it was other types of vehicles. So we need just having that element as our view. The F-150 is a common truck, widely purchased and used in this country. That's correct, Your Honor. So he was driving a Ford 150. The truck was clean. He had Baja plates. He was an I-15. The testimony was that 290,000 cars passed through that corridor every day. And he was 70 miles north of the Mexican border, Temecula. And he'd been driving faster than the flow of traffic. The flow of traffic was somewhere between 80 and 90 miles an hour. And he was going faster than that. He made, I think it was, 10 lane changes without signaling the lane change over a five-mile period. And he looked straight ahead and didn't make eye contact when one of the Border Patrol agents pulled alongside of him. There was no passenger in the car. And your argument is that they stopped him primarily because of the Baja plates and some traffic violations. Is that the sum and substance of your argument? Yes, Your Honor, it is. I think that's what we presented. Is that it? We presented a complete argument. Why is it the kind of thing where an officer trained in these matters and has lots of experience can say, yeah, you know, he's going even faster. He's going for 90 miles an hour. He looks like he's taking evasive action. He's changing lanes quickly without signaling. He is in a vehicle we know to be frequently used in smuggling. He's close to the border. He's got license plates that suggest he's crossed the border. Why isn't there fatality? Why isn't the kind of thing exactly that the Supreme Court has said, in the current circumstances, that's enough to stop him? You're not doing anything but stopping and asking some questions. When we evaluate each of those factors, notwithstanding... And he's a Mexican guy. That's correct. When we evaluate each of those factors, they also have innocent explanations. However... Are there any of those factors that have no guilty explanations at all? In other words, I would think, with all respect to the government, having... If the car were clean, it would be a factor, and if the car were dirty, it would be a factor. So that if you have... If the explanation is guilty either way, don't we have to throw out the clean car as a factor? Judge Hurwitz, I believe that if we look at our vizu, the courts are precluded from eliminating any factor. But can we give it no weight? As I read the testimony of the agents, it was cars that come across the border are usually dirty. This one was clean. Therefore, we assume that it was cleaned up after it came across the border. So either way, it would have been a negative factor against your client, right? It seems to me that it should not have been a factor for evaluation within the calculus. Are we entitled under our vizu to give a factor no weight? Under our vizu's language, it expressly indicates that when factors are evaluated separately from each other, even if they might or one might have an innocent explanation, that factor cannot be discounted merely because of that reason. So I think that certainly there are factors that have no weight, such as the racial identity of a person. Well, actually, our decisions say it can have some weight. Judge Baez's decision in the name of the case that's escaping me for the moment, where he actually found that there wasn't reasonable suspicion, said that the racial identity of somebody might have some weight, but it wasn't enough. If it's the only factor. Your auto case. Yes. Yes, if it's the only factor, you cannot use that as reasonable suspicion. I'm sorry for monopolizing this, but I'm still interested in why aren't, one way or the other, why aren't all these facts together, or whatever weight we give each factor, enough to give rise to reasonable suspicion, in your view? Cumulatively, I don't think they rise to reasonable suspicion, because if you look at it, there is nothing that has been articulated by either of the Border Patrol agents indicating that this is external to a large segment of society. Southern California has an extremely high Hispanic population. Since the advent of NAFTA, there has been both commercial and private trucking companies who are transporting commercial goods from Mexico into the United States. Is there any empirical data about how many trucks or how many vehicles would meet the specific elements that the officers identified? So that type of vehicle, the Baja plates, the speed, the speed of driving. Is there any empirical data in the record on that issue? There is no empirical data, and that's one of the fallacies, in our opinion, that dictates and informs in favor of an error by the district court in denying the suppression hearing. So the district court says we defer to the reasonable inferences of both the law enforcement officers, or give due weight, I think they say, and the district court judge. And so if they make these factual inferences based on this evidence, what would be the basis for the court, this court, the reviewing court, to disregard it? The case of U.S. v. Ornelas is a basis to disregard that. The function of the appellate courts, as was clearly expressed in the decision of Ornelas, is to conduct and perform an independent review. Consequently, the case went on to hold that the conclusions of the lower court, as well as border patrol agents in their articulated factors, is not given presumptive weight or force on appellate courts. If the court says due weight, I don't know whether we give it presumptively, but don't we have to give it due weight? And what would we have to say in order to avoid giving due weight to those factual inferences? One can give due weight and ratify it by giving it presumptive weight. I mean, if there's no empirical evidence the other way, would we have to just rely on our own individual intuitions as judges as to whether that cut too broad a swath of innocent people or not? It's not intuitive reasoning. It is based on Fourth Amendment principles. Fourth Amendment principles clearly indicate that one cannot presume a fact which is not in evidence in order to determine whether or not there was articulable fact to support reasonable suspicion. And because of the lack of particular characteristics associated with this truck, at that time and point, with that particular person, I don't believe that, I think this court would be committing error to presume a fact that has not been established as far as the specific characteristics of that particular truck. Counsel, I have a question about the border, the checkpoint. The record tells us about the checkpoint having a shift change and being closed. Am I correct in understanding that this is a structure, a building, a small building at the right-hand side of the highway? Actually, the way this was described in the testimony is that as one goes northbound on the I-15 freeway, there are four lanes of traffic. Going north, there is a border checkpoint which actually consists of, it seems, well, there's an overhead structure which indicates that the checkpoint would be operational. Within those four lanes, there are Border Patrol agents who are standing with their trucks close to them to stop cars before they pass through that checkpoint. They may, of course, ask each individual driver questions before letting them through, but on the side there would be some kind of an office building, if you wish, but that is not the area where cars drive through. Cars drive through the same four lanes of highway, whether the checkpoint is operational or not operational. There's a secondary area too, right? There is a secondary area, and that would be where the cars are pulled to the side and taken to more or less. It looks just like any other checkpoint in the city. Well, it's very much the same as San Clemente, yes. All you've got to do is Google it, and it's there. So, Counselor, my question, to just finish up, I'm looking at excerpt number 44, page 44, and it says that as the truck approached this checkpoint, it moved over to lane number two. So, I'm understanding the far right-hand lane is lane number four, and that at this point in the action, there's a marked car behind the defendant, and he moved two lanes over to the right. I just want to make sure I'm understanding the record correctly. If I am, he would be moving over two lanes away from the marked car that was behind in the lane number four and also away from the secondary inspection area. But please correct me if I'm wrong. That's correct. If he is moving towards the right, he would be moving from the – He'd be moving on the left. He would be moving from the slowest lane to the faster lane. That's to the left, from lane four to three to two, correct? No, the fastest lane – well, the fastest lane is number one, so the slowest lane is number four. So, if he's – It was a number two. If he was – It was one lane to the right of the fast lane. When he started at the approach to the checkpoint, my understanding is that he was in lane number four, and the marked car was behind him.  According to the testimony, that's what – that's the testimony. And he moved over to lane number two. After passing the check – after driving through a non-operational – I think you've answered my question. Thank you. However, at that point in time, the testimony also supports the fact that Officer Hayes was, he said, at a reasonably safe distance. So, there were other cars on the freeway going above and beyond the posted speed limit. The other cars were traveling at 80 miles an hour, according to the testimony. And all of the cars apparently somewhat slowed down as they went through the border checkpoint – well, through this part of the freeway. The other element that is questionable, as far as reasonable suspicion, is that Officer Hayes indicated that when he activated his siren and overhead lights, that Mr. Valdez-Vega immediately went towards the shoulder of the freeway to stop, although Judge Phillips, in articulating her reason for denying the motion to suppress, indicated that he did not immediately pull over to stop. That is in error and is contrary to the given testimony. And I would like to indicate that when one looks at the cumulative factors of this case, Judge Phillips did reject the cleanliness element of the truck. She indicated, however, that slowing down was a change of behavior. According to our visa, sometimes can be damned if you do and damned if you don't. So, there – Well, that's true here, isn't it? Because the officer said at checkpoints, people often change their behavior. And sometimes they speed up and sometimes they slow down. So, it is a dirty truck, clean truck, slow down, speed up, correct? That's absolutely correct, Judge McEwen. And we don't – we have – certainly, we have precedent in this circuit, indicating that those types of boilerplate, if you would, factors, should not be and are not sufficient to stop someone, and it would be contrary to the Fourth Amendment. However, I think that the court is also informed by the case of Socolow, where he and a companion were going through an airport. He had paid for two tickets in cash, $2,100, from a wad of $20 bills that seems to be maybe $4,000. And he took evasive paths through the airport.  And the courts indicated traveling under an alias certainly has an innocence explanation. Perhaps someone is going to a hospital or a clinic, and they seem to exclude that from much weight or from having much weight. Also, taking the evasive path through the airport. They indicated that has an innocence explanation. Perhaps they don't want to encounter an angry acquaintance or a creditor. However, the other element of paying in cash, they knew at that time that he had come from Honolulu or Miami, rather, and Miami was a great hub for this type of drug transactions or smuggling. So there you have very particularized information regarding that particular person. In cases like… It doesn't strike me as any more particularized. I mean, he comes from Miami, where tons of people come from. Lots of people carry cash. All those factors, if you look at them, they could be evading creditors by dodging in the airport. Remember, Socolow was our case, too. I remember when we got to the worst part in that one. You're down in about two and a half minutes to 105. May I just ask you one quick question? Yes. Judge Kristen's question about moving from 2 to 4, as it appears in page 44 of the exit, I just read that part. I can't tell whether that happened before the checkpoint, in the checkpoint, after the checkpoint. I understood you to say it was before the checkpoint. Is that something that's established in the record? Because he pulled right up alongside him. I can't tell from that where and when these events occurred. Your Honor, I don't believe, and if I did, I misspoke. I believe I asked what's the reference to after he had passed that part of the freeway. That would have been the checkpoint, had it been operational. Isn't that in the officer's testimony rather than his declaration? It is in the testimony, and page 44 is the declaration. But the testimony is different from the declaration under cross-examination. So, Judge Reinhart, I would indicate that, yes, it is vague as to whether or not he had just passed the non-operational point or if this happened before. But as a lot of the testimony relating to the factors relied on by the Border Patrol agents, it was imprecise. And although an analysis of reasonable suspicion is not a precise standard or fluid, we can say that this is so imprecise that it would capture a large segment and that even each of those – Well, I spoke from line to line repeatedly, so the question was I gathered whether this occurred right before the checkpoint. Well, when agents – I don't want to take you down to 33 seconds. I know Judge Kuczynski – When agents – Excuse me. Yes. I said I know Judge Kuczynski is a very generous presiding judge who will certainly give you a couple of minutes more. But don't use any more than you need to. Thank you very much. Thank you. We'll hear from the government. That's the last thing he said to me all day. All week perhaps. Ever. Ever, yes. Good morning, Your Honors, and may it please the Court. Mark Yohalam on behalf of the United States. Before I get into some of the general issues in the case, I wanted to respond to a few factual questions that the Court posed, starting with Judge Reinhart's question at the end. At pages 91 and 92 of the excerpts of record, Agent Hayes clearly testifies that the move was before the checkpoint, that they passed through the checkpoint in Lane 2 and started in Lane 4. So prior to entering the checkpoint, immediately prior were the two lane changes that Judge Christin discussed. Counsel, can I just ask, why is that of any significance given the description we've got, which is if the checkpoint were operational, it sounds like Border Patrol agents would be in each lane. So why is that significant if it's changing lanes right before it? Well, to begin with, it's something that Agent Hayes in his declaration says is something that smugglers often do as they pass through it. And this Court, that's uncontradicted, sworn. Why? I didn't see any explanation for why. It doesn't make any sense. If it's operational and there are agents in each lane, why are you advantaged if you're a smuggler by cutting over to get away from the right-hand side? So two reasons. One is there are additional squad cars parked in that right-hand area. There are additional officers in that area. So potentially you're creating a little bit more distance if you need to get away from them, although at that point you're giving up on not being detected. But also at this point the checkpoint is closed. As he's approaching the checkpoint, he can see that the checkpoint is closed. Even when the checkpoint is closed, however, there can be officers still in the kiosk area on the right. There can still be squad cars parked. Is there any record as to whether there were or whether he could see any? No, there's not. How do we know in terms of what you just said? Is that anywhere in the record? Well, what is in the record is Agent Hayes's declaration, I think. But beyond the details of sort of the physical layout is not in the record. The information about there being officers stationed in each lane is not in the record. What is in the record is that Agent Hayes says based on his training and his experience in interviewing smugglers that a technique they'll do is to get over to the left. And I will say, I mean, it's one of those things where I wish I had sort of a beautiful answer to you, Judge Watford, but the behavior is so unusual that there has to be some explanation, right? He's going over 90 miles an hour in the slow lane and then cuts into the fast lane and sharply decelerates down to 70 miles an hour or lower. That behavior is sufficiently unusual that I think it itself corroborates Agent Hayes. It draws attention to you. He thought he was driving on Los Angeles freeways. That's the way they all drive. Perhaps near the interchange of the 105 and the 110. Can I take you back to what you were just talking about? We've got a timeline here. Yes. Describe for me when on the timeline the officers obtained reasonable suspicion. You know, I think it's a difficult question. I know. That's why I asked it. So, you know, we only need. I mean, because I asked this and I want to be straight with you on it because I discount some of the factors the officers relied on. So I want to figure out where along the way if I'm discounting factors, if I move backwards. So let me just ask it sort of differently. Did they have reasonable suspicion before Mr. Valdisvega went through the non-operational? If I may, may I answer sort of a general answer and then the specific? Sure, as long as they get a specific one eventually. I'll answer the specific question. All right. Well, let me answer the specific question. I think the answer is yes, that they had reasonable suspicion even before he. Okay. So now let's go back to what they knew before he went through. Let me please give the general answer too. Not give the general one. I'll give you the specific answer first. Did you have the general answers to give too? Yes. The general answer is that the government isn't here asking the court for an advisory opinion about what the minimum standard of reasonable suspicion is. The point in time at which the court measures the reasonable suspicion for this case is at the point where the defendant ultimately yields to the show of lawful authority. And so though I'm sort of eager and willing to try to defend the stop hypothetically if it had happened earlier, that's not the question before the court. The question before the court is at the end of the process. Yes, but here's my difficulty with that. There are some factors along the way that we may decide not to give very much weight to. For example, I'm not sure that if you're driving 70 miles an hour, not looking at the person next to you out of the side window is something that gets much weight. I hope you're looking straight ahead. And I'm not sure the clean car gets much weight. And some of these occur, some of these come to the officer's attention at different points along the way. And so if, as I suggest, we might, we discount the behavior of Mr. Valdisvega once he knows there's a police car behind him going through the non-operational thing. I'm trying to figure out whether or not there was enough before then, and if so, why. Well, I also want to engage with your damned if you do, damned if you don't question in depth. But the fact that you're suspicious of or that you're discounting happened quite early. So the not making eye contact I think actually occurs sometime before going through the checkpoint. The fact the vehicle is dirty is something that Agent Lopez sees before. Clean. Clean, I'm sorry. I want to work either way. Well, I don't, respectfully Judge Reinhart, I don't think it works either way. Certainly in some circumstances a dirty vehicle where, for example, there are not Mexican plates, might be relevant information of a car having been taken off road to cross the border in an area where there isn't a border checkpoint. But where the vehicle does have the Mexican plates, I'm not sure that the vehicle being dirty would have really added anything to the reasonable suspicion, whereas here the cleanliness of the vehicle, as Agent Hayes explained, does add some suspicion. I don't think it's a lot, but I think it does add some. But in any event, that was something that was observed quite early on. Yeah, so let's get back to where. Before he goes through the checkpoint, what they know is we've got a F-150 with Baja plates that's driving crazy. But with respect, it's not driving crazy. It is driving dangerously, but it's not just random. It's a method of driving, a counter-surveillance method. And my opponent says the officers don't use that term. They do. In both of their declarations they call these counter-surveillance methods. And one of those is changing lanes repeatedly directly in front of another car. Now, there's a small correction to what Judge Prengerson said. Agent Lopez sees that happen ten times, and at least ten times, at which point – Counter-surveillance tactics is just making yourself obvious, changing lanes back and forth? Is that it? No, it's – I mean – It doesn't sound dangerous. It's driving a little crazy, so that's counter-surveillance. I've never heard that one before. Well, respectfully, I think that is, in fact, a counter-surveillance technique, particularly when there's a lot of traffic on the road. Did the officers testify to that, that it was a counter-surveillance technique? Yes, they did, Your Honor. What page does that come from? Both of them, in their declarations, at page 41 and 47. All right, but that's – Did they testify to that? They weren't asked about it. My understanding of what you're saying on 41 and 47 is they just said we're familiar with counter-surveillance. They don't say this is a counter-surveillance tactic. Is that a fair statement of what the evidence says? Respectfully, I don't think it is, Your Honor. Can you point me to the record where it says this is a counter-surveillance technique? Yes. So they say – What page? This is page 41 to 42, and similar language as in Agent Lopez's declaration. So he says, I have interviewed numerous alien and narcotic smugglers and learned about their smuggling and counter-surveillance methods. These methods, which surely must be referring to counter-surveillance and smuggling methods, include driving at a high rate of speed through the checkpoint, slowing down the presence of officers, avoiding making eye contact, keeping rigid movement, while appearing relaxed in an unmarked unit. They'll often move to the farthest lane as they pass through the checkpoint. They'll position themselves in front of other vehicles as much as possible to complicate law enforcement's efforts to follow or stop them. So now what there isn't there, and perhaps this is what you're driving at, Judge Thomas, is that there – Lane changing. Well, I think there is where they say that they will position themselves in front of other vehicles as much as possible, and what Agent Lopez testifies to seeing is seeing him change his lane to put himself directly in front of other vehicles. So the testimony that both he and Agent Hayes give while under cross-examination is that they see the car – and I think it's in their declaration too – make lane changes in front of other vehicles, causing those vehicles to slam on the brakes. And so, yeah, that is consistent, I submit, with the methods that are laid out here. Does it also say driving at a higher rate of speed than any other cars? They do say that when the checkpoint is closed – No, not the checkpoint. All this driving at these high rates of speed came before the checkpoint. Yes. That's what originally caused the suspicion. And so what they say is that when they know that there's been a Border Patrol shift change, and this was a time when that normally took place – They didn't know that here. They didn't know that here. This just – that change happened. I'm just trying to find out whether the driving at this high rate of speed was one of their techniques. And what the officers say is that driving at a high rate of speed when a checkpoint is closed, which they could know from a scout car, as a way to get through the checkpoint as quickly as possible while it is closed. This is way before the checkpoint that they were driving at this high rate – 90 miles an hour. Yes. Which I would have thought that they would have been badly advised to do that because you're trying to keep from coming to their attention, not to do everything you can to cause attention. So two answers. One is it was five miles before. It was not way before. And what the officers testified is that sometimes the car carrying the contraband will operate in tandem with a scout car that will be some distance ahead and that a scout car could notify them that the checkpoint was closed. And in this case, part of what triggered Agent Lopez's suspicion that there might be a scout car was that immediately after a marked car with whom Agent Lopez was working pulled off the freeway is when the F-150 comes speeding up the slow lane at 90 miles an hour. And in terms of whether – I understand the court's skepticism about why is all this sort of obvious law-breaking, traffic infractions, how is that counter-surveillance driving? But one thing that the Supreme Court has been clear about is that is exactly the kind of substitution of this court's intuition for the training experience of the officers. These are officers who – it's not just that I'm proffering to the court two rookie Border Patrol officers and they went to FLETC and did fingerprinting analysis, and I'm saying that that's a basis for this court to defer to them. Between the two of them, they have about 20 years' experience. The majority of it is at this area. And they've been trained in identifying smugglers based on their driving techniques. Hayes took advanced seminars in that. And if you look – In the case in front of us, it's always right. In other words, in the case in front of us, their intuition is always correct because otherwise there wouldn't be a prosecution. And we don't have any evidence in this case about how many times they have stopped similar cars and found nothing in them. And so their experience gets some weight, but the Supreme Court has told us that we need to develop a set of case law that delimits when there is reasonable suspicion and when there isn't. We do de novo review of these, the Supreme Court tells us, so that we can set a continuum. So why is this? And our visa is on one end of the continuum. It's pretty easy. They're driving in the desert. It's a strange place. They don't look at the people next to them. And on the other end of the case, we have the continuum, at least in this circuit, we have Corrado, where the panel says it's not enough that they were Mexicans in Montana, which seems awful suspicious to me, Judge Thomas, I'm sorry, hanging around a high school game. There's got to be more. So tell me why this case – where in that continuum this case falls and why the government wins on that. Sure. And I'll first say that though we don't have information about their success rate in the field, in Harris the Supreme Court specifically said that that's not a basis. No, no. All I'm saying is that there's a little bit of post hoc here. These are really experienced guys, and look what they came up with. And the answer is in the case in front of us, they're always right. Their suspicions were correct. Except in the 1983 suits and Bivens actions that come before the court, which do happen. And, I mean, also in Harris the Supreme Court does emphasize that the law enforcement has a strong incentive to do correct training and to develop correct profiles because they don't want to waste their time on false stops. I agree with all that, but Arvizo's – this isn't Arvizo. There's a lot better facts in Arvizo. And so my question is, since this is less than Arvizo, why is it reasonably suspicious? So Arvizo has better geographical facts than this does because it's off the road. I actually think this case has better behavioral facts than Arvizo did. So Arvizo, you basically just have a guy. He's driving on this road. He slows down when he sees the border patrol. He doesn't wave to the border patrol officer. And instantly this goes to your damned if you do, damned if you don't question. The Supreme Court says it's both suspicious that the driver didn't wave and suspicious that the kids waved so much. So, I mean, the Supreme Court has endorsed that both a behavior and its opposite can be suspicious when they're at two extremes. But – It's a country road in Arizona where there's no traffic at all. And somebody pulls alongside of you and you don't acknowledge them. That's different, the Supreme Court said in Arvizo, than a busy highway in San Francisco. Now we've got a busy highway near Temecula. So tell me why the Supreme Court's behavior doesn't work. So the next instance that the Supreme Court says is that, therefore, the court has to defer to the officer's familiarity with the area in interpreting the behavior. But here I don't think – look, there are factors in this case that I agree with my opponent do not get us to reasonable suspicion, whether you're evaluating them separately and just adding them or if you're doing the approach that I suggest the court should have and a more holistic approach. And that's things like, look, being on I-15 is more suspicious than being on the 110 freeway. But it's not ultimately anything like the road in Arvizo. Driving an F-150 is more suspicious than driving a smart car, as the district court noted. But it's – driving an F-150 on I-15 is not enough. You add in the Baja place and you're getting closer, but I think even then there's going to be a close – Now you're getting close to what I'm asking about. So what tips you over? So here's – I think, and I'm not going to put a lot of weight on this because you don't, that the cleanliness gives it a little more. And then it's the driving, which – and it's the way the car is moving and the way the driver is behaving. And both of these things – the behavior of the driver standing alone, I understand that this court is sometimes skeptical of the rigid posture. It is something that the Supreme Court has endorsed and that this court has endorsed as sometimes being in – you know, it does add something. But it's the lane changes, not one, not two. Sigmund Ballesteros had one safe lane change. This is 10 lane changes in front of other cars just seen by Agent Lopez, followed by numerous more seen by Agent Hayes. And it's not just that there are lane changes or even just that there are lane changes in front of other cars. It's the particular behavior as it approaches the checkpoint of going from speeding in a slow lane to slowing down in a fast lane and doing that in this, you know, extremely dangerous double cross of lanes that causes cars to slam on their brakes as he goes through it. And then when Agent Hayes tries to get close to him, he tries to make distance from Agent Hayes. And then they get through the checkpoint. And at this point I would say there is certainly reasonable suspicion. But where I think it goes beyond doubt is Agent Hayes puts on his siren. And this is a factual correction I'd like to make. Let me just ask you this because I thought you would be willing to concede that you don't get credit for any fact after the agent puts on his siren because he's already made the determination to effectuate the stop. So how can you add in additional facts after that? Judge Watford, that's just the Smith case in this court holds. It's when you submit to the lawful authority. So, for example, if a police officer says, stop police and you run off, the running off can contribute to the suspicion. What happened in Smith is the officers turned on his siren and the person started to make a U-turn. And this court said that that failure to yield, which was aberrant behavior as described by the officer, followed by behavior that the officer viewed as evasive went into the suspicion. And the reason why is because the subjective suspicion of the officer doesn't matter here. What matters is at the time when the seizure takes place, was there reasonable suspicion? And the seizure doesn't take place until the submission of the lawful authority. So it's the driving here, right? I mean, to just rephrase what you said, you have a lot of stuff but it doesn't quite get you to reasonable suspicion. But it's the driving, the totality of the driving that gets you there. Is that what you're saying? Well, but you can't look at that in isolation either. Well, I'm not looking at it in isolation. I thought you said, I've got a bunch of these factors, but without the bad driving, they don't add up to reasonable suspicion. Is that fair? Well, I said it would be a close call at the point where you include the criminalistic car in the Baja case. But again, it's not crazy driving or bad driving. But let's assume, contrary to fact, that this guy was driving perfectly, right out of the manual from the California Highway Department. Would you then have reasonable suspicion? You potentially might. Yes or no? Well, I guess I need to know more about what facts we're still including here. Everything else. Everything else is exactly the same, but he drives like... He won't make eye contact and he won't pull over. He drives perfectly. Everything else is exactly the same. And so, for example, an agent of his turns on his sirens and there's a wide spot in the shoulder. So what happens, just to be clear because my opponent I think slightly misstated it, the sirens go on and immediately, and this is at page 106, Valdez Vega pulls over into the right lane. He does that immediately. And right there is a wide, safe place to stop. He does not pull out there. He keeps going, what Agent Hayes says is much longer than a normal person takes to stop, and then stops where there's a sharp grade off the side. It's so narrow that the F-150 can barely fit and there's semi-traffic. Well, but let's go back to my question because I want to follow up with Judge Watford's question. That's why I want to make it a clean air. Let's assume everything is exactly the same except his driving until the lights go on is perfect. But he still fails to pull over. Now, let's take it right up to where Judge Watford's question, right up to where the lights go on, his driving is perfect. Do you have reasonable suspicion? I think you might. I think you might doesn't help me. It depends what you mean by perfect driving. Let me say, because if what you mean is his driving was the exact same as everyone else on the road, then I think you would put me in a very hard case. But if what you mean is that someone is scrupulously adhering to the exact speed limit, signals well in advance, everything is just a flawless 1950s driver's ed video, that could be cause for suspicion. And the reason why is that suspicion is triggered by behavior at the extremes of what is normal behavior. That's the error of this court's damned if you do, damned if you don't jurisprudence. The core of that premise of that jurisprudence is right. If one officer says driving a black car at night is suspicious because it's hard to see, but driving any other car is suspicious too because it means you're trying to avoid suspicion by not driving a black car, by all means, this court should throw that out. And the district court should say you're not credible and I don't believe you. But that is not what happened in this case. What happened in this case is behavior at the extremes. So, for example, a person whispering and a person shouting are two opposites. But both of those are more suspicious to anyone, any one of us, than two people having a normal conversation. If we see two people conferring in whispers, we're probably going to look a little more carefully. If we hear two people in a loud argument, we might stop and stare. Going naked is the opposite of wearing a trench coat. I can't hear you. I can't hear you. I apologize. Going naked would be the opposite of wearing a trench coat, gloves, and a ski mask. Those are two opposite behaviors, but both are suspicious. And so here, if what Judge Hurwitz is proposing is that. I'm not proposing anything. I'm just asking a question. I'm trying to figure out whether or not it's the driving, in your view, that tips this over the line. And I'm trying to ask a hypothetical that you won't accept. So let me try it again. If he was driving just like everyone else on the freeway. Yes. I do not think you would have taken this case en banc. Well, I didn't want to take it in the first place. The question in my. I'm still asking. I think it's an easy question from your perspective. It's either a yes or no. Assuming the driving was driving that would not raise any suspicion. Okay, that's probably a better hypothetical. And take us right up until the point where the lights go on. When Mr. Valdez Vega is being pulled over. Is there reasonable suspicion that he's committed alien smuggling or drug smuggling at that time? Probably not. So in your view, it is this totality of driving and response to the red lights that gives rise to reasonable suspicion that he is. That tips us over the line from some suspicious facts to enough to give reasonable suspicion. Is that fair? It's the. Yes, it's the driving behavior. That means the totality of facts. I understand. No. Yeah. And you're right. It has to be your argument, as I understand it. So I'm not trying. So. So the question for us is whether this driving behavior is enough to get us over the line to reasonable suspicion. When taken in conjunction with the other facts. Yes. Okay. Thank you. And I apologize for making you drag that out of me. I just meant to be a semi-friendly question. It's a defense mechanism from law school that I assumed that was going to be the path. You assume that there's a trapdoor at the end of it. So I wanted. Yeah. Your position isn't quite what Judge Hurrell was suggesting. Right. I just. So I'm clear on this. It is not that something tips over the line, that the driving behavior tips over the line. It is that if we include all the circumstances, including the driving behavior, they amount to reasonable suspicion. Not that there's one behavior that sort of makes a difference. Yes. And I apologize if I wasn't clear about that. I accept Judge Kaczynski's amendment. It's no. Well, I'm still trying to. But your position is that without the bad driving, you don't get there. It's a close call, but thinking about it right now, I'm willing to agree that that would probably not be. But I don't think. Fair enough. And I think part of what you're driving at, Judge Kaczynski, is that I'm not suggesting that it's just the driving taken by itself, stripped of other circumstances. I think we're all on the same page. I think Judge Hurrell was probably just phrased a little bit differently than I would have, and he agreed with my phrasing, so we're fine. Okay. That once you add the driving and you then take them to a trial of these circumstances, that in your view amounts to reasonable suspicion. Yes. But without the driving, you're saying it's a close case. Probably not. Yes. And what I want to include in the driving is also this failure to submit to the life. Well, I think what happens is Judge Hurrell has brought you to that point, and that brings us to Judge Watson's question. Okay. Judge Hurrell, do you want to take this one? Well, Judge Watford tried. I think we were at the point where we're not including the... The post-checkpoint behavior. The failure to submit behavior after he turned on the... Here's my problem with that. So now we're going to take up that aspect of it. Here's my problem with that. I think it's a problem Judge Watford suggested, which is that if you don't have reasonable suspicion when the lights go on, then it seems to me that Border Patrol can follow along people who they don't have reasonable suspicion of, turn on the lights, and develop reasonable suspicion because they don't pull over quickly. And that seems to be... It's a boost. That seems to me to cover the entire population. The entire population of people that you don't have reasonable suspicion against, you can't develop it by coming up behind them and turning on the lights and see what they do. So it seems to me you've got to have it before then. I think that's what Judge Watford was asking. I think that... Again, respectfully, I think that argument is foreclosed by precedent, which just says that you evaluate the reasonable suspicion at the time... What case is that? This is the Smith case. And it's cited in our brief. Unfortunately, my note's in front of me. I don't have the pin site. But what Smith says is that it found aberrant behavior to a facially illegal command by a police officer was relevant to reasonable suspicion. The failure to immediately submit, followed by actions the officer interpreted as suspicious. Can I search the case? Yes, Your Honor. Just looking over the whole thing. Does that sound right? I think it's more recent than that, but I'm not... If I can... May I? I'll just step back to my desk and I'll... Go ahead. Not so fast with that step. It is the 217F3rd at page 750. But I don't think Smith is an outlier. I think there's also a Supreme Court case that talks about... It's an on-foot case where they say stop police and the people take off running. And the court says that it's not a stop until the person's actually seized. And the person's not seized until they either submit or are physically restrained. But can you respond to my concern? What the Supreme Court tells us is that in these reasonable suspicion cases, we need to be careful that we don't develop a profile that includes the entire population. So if you don't have reasonable suspicion and you pull up behind somebody and they act crazy, once you turn on the lights, does that distinguish drug smugglers from the rest of the population? I would freak out if somebody came up behind me and turned on the lights. I don't know what my behavior would be. You would follow the law and you would promptly pull over. Perhaps. So I think your question sort of has two parts to it. One is a legitimate concern about a sort of nightmare scenario of Border Patrol flashing their sirens all the time and doing this as a way of goosing, I think was Judge Kaczynski's word. Goosing, illegal term. You know, if that were to happen, I think the proper vehicle to address that would be civil litigation. And this court sees that. But I don't think there would be a Fourth Amendment problem with officers. I suppose if it were shown to be a broad practice, perhaps there would be a Fourth Amendment problem. But I think your second half of your question was sort of a factual one, which is, is there really anything indicative of smuggling about acting crazy in response to a siren behind you? And first, again, it's not crazy behavior. It's a specific kind of behavior, which is immediately pulling over to the right lane, but then not going the safe shoulder, continuing longer than normal, which is what the officer said, and then pulling in an unsafe area. I don't know anyone who would act that way. I mean, I do think, like, I'm a very anxious person. I might not want to pull over alongside a cliff where there are semis pulling over, and I might hope that the officer would let me wait until I got to a wide spot. But I wouldn't pass up a safe spot to go to a dangerous spot. You said that the position that I was sort of advocating is foreclosed by precedent. Smith, of course, is a three-judge panel decision, so it's not binding here. Is there some Supreme Court case that you were relying on besides that? As I said, my recollection is that there is a Supreme Court case involved. It's certainly not cited in Smith. Yeah, I would be happy to submit a short letter to the court. Like I said, I believe the facts of the case are that people take off running when the cops say stop or go over to talk to them or something like that. And it involved what evidence could be suppressed, because I think what happened is they threw away, like, some crack while they were being chased. And the question was whether – I think everyone agreed there wasn't reasonable suspicion for the initial stop, like when the police said stop. But the question was whether the crack could possibly be suppressed. And I believe what the court said was that there was no stop at that point. Was it an R.E.D. case? Is that the one you're referring to? It may be, yes. When were the officers – getting back to when you have this shift change, when did that happen? When did that change take place? So there used to be shift changes until quite recently before the stop. That hour was the time when one group of officers would leave and other officers would come back. That was no longer the case. It had recently – the shift hours had been adjusted. Then the checkpoint itself was closed independently. That wasn't known. That wasn't – that just happened. Right. The day or two before. Right. So it wasn't anything that you would expect that someone driving through would know, that the place would be closed at that particular point of time. That's right, isn't it? No, it's not, because often what smugglers will do is operate in tandem with a scout car. So they know all this? The smugglers know all this? Well, does every smuggler know everything about the Border Patrol? I mean, probably not. But what they do know, and what Agent Hayes said they do know, is that smuggling organizations know about Border Patrol shift changes. So that's why this time, which was historically a shift change, was a high smuggling period. Did this just happen? It changed. This occurred. Yeah, so two separate things are at issue here, and I think I'm being confusing about it. Yeah. One is the personnel shift change. That's a fact that smugglers knew about. But in this case, the smugglers would actually have been wrong. This was no longer a shift change. That was no longer the case. The second is the closure of the checkpoint. And smuggling organizations will not have, I hope, an advanced schedule when checkpoints will be closed. How did they get this, from the Border Patrol agents? They planned this out. The shift change is by observation. So they have, in addition to actually the couriers, they have scout cars, and they just have people observing behavior on the Border Patrol. There's a degree of cat-and-mouse game going on, where the Border Patrol is trying to learn smugglers' behavior, and the smugglers are trying to learn the Border Patrol behavior. And in terms of the closure of the checkpoint, the way they would find out is by having another car maybe five minutes ahead of you on the highway, looking out for marked police cars and calling back on a cell phone or looking out to see if the checkpoint was closed. And if you see that it's closed, then you say, haul as fast as you can northbound. The checkpoint is closed right now. Let's get through. Why would they close a checkpoint? Probably budgetary reasons, Your Honor. Oh, come on now. It's not the public defender's office. I don't have an answer here, but I think they don't leave the checkpoints open every day, 24 hours a day. They have hours that they're open and hours that they're closed. Well, you're going to be able to do that soon when you get the surge. It's like the post office, right? Yes. Anyway, you are much over your time. Unless my colleagues have further questions, I think we'll thank you. Thank you very much. Thank you. We'll return to. Incidentally, if you have cases on the questions that Judge Walker was asking you, you may submit 28-J in the next 24 hours or so. Okay. Would the court want an argumentative 28-J or just a list of citations? I think the only thing you should include is the case and just a description. This is in response to this question. Just to be clear, what the- What was Judge Walker's question? I believe, if I understand correctly, the question was whether post-stop behavior, when the police, the time between the time when the police identify themselves and the suspect submits, whether behavior in that interval can count towards fondness suspicion or reasonable suspicion or perhaps probable cause. Behavior between the show of authority and the submission. Exactly. So if you have something like that, submit it in the next 24 hours or so. Okay. Thank you very much. And do so chronically. Electronically? Yes. I don't know that stuff. No, I know. I guess it was quick. We'll do. Thank you, Your Honor. Okay. Thank you. We've given this additional time. We'll give you three minutes for rebuttal if you wish to take it. Thank you, Your Honor. I would like to point your attention to page 93 of the excerpt, which clarifies at the point, and the reaction of Mr. Valdez Vega. It begins on line 3 of excerpt page 93. Question. How far south of 79 did you pull? Did you signal for the driver for the red truck to pull over? Answer. I activated my lights and sirens at a spot we call the wide spot. It's very wide. It's big enough for the semi-truck to park. He passed that area. And then he goes on on page 107, and he indicates, I think it's 107. He indicates that, 106, excuse me, when you activated your lights, what lane was the red vehicle in? He was in lane number 2, and he pulled immediately over to lane number 4. That's a mile and a half. That's a mile and a half past the checkpoint, correct? Yes. It was a mile and a half past the checkpoint where Hayes actually activated. That's page 93. Yes, 93, and then the lane that he was in is at page 106. So that does clarify that there does not seem to be, based on that testimony, an attempt to escape. And the reference by the government to – I'm sorry. I don't understand how that is. Can you explain? Yes. The fact that the lights and siren were not activated until Hayes was at the white spot, and the truck was in lane number 2 and had to maneuver to lane 4 and then to the shoulder. 4 is the lane all the way to the right. 2 is the faster lane. 4 is the slower lane. So the truck was in the faster lane. Once the lights and the siren were activated, according to Hayes' testimony, the red truck immediately pulled over. And the testimony was that he recognized, the truck driver recognized that he was being pulled over and immediately moved over to the slower lane and to the shoulder. Therefore, I think that negates the government's position that there was – Since line 12 says, after a prolonged vehicle stop, he did eventually stop on the right-hand shoulder. This is on page 107, line 12. And then question 14, is that the reason one of the factors that he pulled over was because of prolonged vehicle stops? So it sounds like he was testifying that it took him a long time to actually stop. Well, if he did testify to that, Your Honor, we would submit that it's a contradiction. I'm looking at 104. I was going to ask the government this, but I just don't quite get all the – 104 says in terms of the stop, it was about 100 to 200 yards. Is that consistent with what you – At page 104, Your Honor? Yeah. Am I reading that correctly? And which line is that? I'm looking at 1819. It puts his lights on at the white spot or close to it. It pulls over how many miles in terms of miles, not miles, yards, maybe 100 to 200 yards. That's what his testimony is, but I think it's still imprecise because his testimony is certainly that Mr. Valdez Vega was in the fast lane. He had to move from the fast lane over from other cars that were going presumably 80 miles an hour. Actually, I think that was in your favor, the 100 to 200 yards. If you used the driving formula, which I know because my son's in driver's ed, that's pretty fast. But I think we said in our brief when you calculate the time from going 70 or 80 to the shoulder that it would be within that spatial time frame. So, again, that is favorable to us because it doesn't indicate that he was trying to evade the officer. What do you make of the officer's testimony in any event that it was longer than normal? Well, I think he was trying to support his position of reasonable suspicion. And I think at this point that reasonable suspicion either had to exist or it didn't have to exist. And, you know, the fact is that when you compare it to what the government's argument was in Smith, that the person had made a U-turn and that was considered part of the reasonable suspicion. Well, a U-turn logically indicates that someone is trying to go in the opposite direction from the person who's following him. This does not equate with that at all. This equates more with the Garcia Camacho case where somebody was actually staring straight ahead, did not acknowledge the Border Patrol, and the Border Patrol pulled him over. This was not considered reasonable suspicion. And I would submit it at that unless there are further questions. Thank you. Here's your final testimony. We're adjourned.
judges: Kozinski, Pregerson, Reinhardt, Thomas, McKeown, Gould, Bybee, Ikuta, Christen, Watford, Hurwitz